# Richmond

DENNIS EARL WILLIAMS V. R. E. PETERS, ADMINISTRATOR, ETC.

March 5, 1973.

Record No. 8000.

Present, All the Justices.

*Ulysses P. Joyner, Jr. (Somerville, Moore & Joyner,* on brief), for plaintiff in error.

*Vance M. Fry,* for defendant in error.

HARRISON, J., delivered the opinion of the court.

Dennis Earl Williams (Williams) questions the sufficiency of the evidence to sustain a verdict recovered against him by R. E. Peters, Administrator of the Estate of Doris Ann Keyser, deceased (Peters) for the death of the decedent in an automobile accident.

Williams brought action against Peters to recover for personal injuries received in the accident. Peters brought action against Williams, Jasper DeVall Witt and James R. Foley for the wrongful death of his decedent, and the causes were consolidated for trial. On motion of Peters nonsuits were granted against defendants Witt and Foley.

At the conclusion of the evidence, respective motions were made by Peters and Williams that the evidence of the other be stricken and summary judgment entered, which motions were denied. The jury returned a verdict of $25,000 for Peters, to be divided equally

between the husband and son of the decedent, and an additional $500 for funeral expenses. The jury found for the defendant in the case of *Williams* v. *Peters, Administrator.*

Williams moved that the money verdict in favor of Peters against him be set aside as contrary to the law and evidence. This motion was overruled by the trial court and the final judgment entered in favor of Peters is here on review.

The accident occurred at approximately 11:30 A. M. on March 3, 1969, on U. S. Route 29 about 1 mile south of Remington, Virginia. This two-lane highway runs in a general north-south direction and is straight for approximately ½ mile north and 50 yards south of the site of the collision. A southbound traveler, as was Williams, would be approaching a curve to the left at that point. Vehicles proceeding south, and for approximately 100 yards north of the point, are prohibited from passing by a solid line.

Williams was driving a 1967 blue four-door Chevrolet sedan owned by his father-in-law, Jasper DeVall Witt. In the front seat of the vehicle was Williams' wife, Sandra, and in the rear seat were Mr. and Mrs. Witt. The other car involved was a brown 1964 or 1965 Rambler two-door sedan driven by Doris Ann Keyser, and occupied by her 14-month-old child. She was proceeding north on Route 29. Mrs. Keyser was killed in the accident and the child and all occupants of the Williams car were injured.

Earlier in the day Williams and the others in the Witt vehicle had attended funeral services in Springfield for his brother-in-law. They were en route to Lynchburg for the interment, scheduled for 4 P. M. Following Williams was a brown and maroon Plymouth station wagon driven by James R. Foley, and occupied by him and his wife. They too were members of the Witt family and en route to Lynchburg.

State trooper L. N. Stephens, Jr. arrived at the scene of the accident shortly after it occurred and before the cars had been moved. He found the Williams vehicle in a ditch along the west side of the highway facing south toward Culpeper. The left front and left side of the car were badly damaged. The Keyser vehicle was north of the Williams vehicle on the west shoulder of the road, headed into the ditch with its back end sitting out a short distance in the southbound lane. Across the road from the Keyser vehicle, in the ditch on the east side of the road, was the entire front end of that car, which had been sheared off at the firewall. Both vehicles were damaged beyond repair.

The trooper testified that he found skid marks in the northbound lane which began 122 feet south of the collision. He said that the marks continued in the northbound lane until the outer or right mark veered off the hard-surface on its eastern edge; that the marks then veered sharply to the left and into the southbound lane where they led up to the rear wheels of the Keyser vehicle. Stephens said he also found three gouge marks in the pavement that "looked fresh". These marks were all on or near the center line of the road. He said there was a considerable amount of debris in the road, "the biggest majority" of it being in the southbound lane. He noted other skid marks in the road, including two short marks straddling the center line, but was unable to connect these marks with the accident or to either of the two cars involved. He said that at the point where the marks in the northbound lane left the hard-surface of the road on the east side, there was a 3- or 4-inch drop or depression between the hardsurface and the shoulder. This was the point where the swerve marks abruptly veered left back across the road to the west and into the southbound lane of traffic.

The trooper testified that Williams stated to him: "We were traveling south, we had passed cars just before the accident. Mr. Foley in a Plymouth station wagon brown and maroon passed behind me. I looked up in the mirror and saw him then a split second before the impact there was a car in front of me sideways. We had gotten back on our side of the road when the impact occurred."

Williams' testimony was that immediately prior to the collision he was driving at a speed which he estimated at 55 miles per hour and that Mr. and Mrs. Foley were approximately 50 yards behind him; that they had passed a vehicle some distance north of the scene of the collision; and that he had observed the Keyser vehicle approaching in the northbound lane some 400 or 500 yards away but, noticing nothing unusual or abnormal about the manner in which it was being handled, he did not watch the vehicle as it approached or become aware of it until just prior to the impact. He described the Keyser vehicle as tannish-brown and said that he "caught a sudden glimpse of it *** it almost came from nowhere and was cross-ways in the road and it collided with the front end of my vehicle". Williams said the accident was "just an instantaneous thing. I mean it was all of a sudden. It was on its own side and then it seemed, you know a split second it was in front of me, and it was for that reason I had no chance to apply brakes or blow a horn or anything—it just happened that fast that I didn't . . . have a chance to do anything really."

He said that immediately prior to the accident, and at the time it occurred, he was driving in the southbound traffic lane.

Williams, a truck driver by occupation, was asked why he looked in his rear view mirror prior to the collision and watched to see if Foley was passing a car. He responded: "I use the rear view mirror only to know where vehicles are on the highway when I am traveling. It is a good driving habit." He was most positive that he and Foley had both completed their passing maneuver of another vehicle and returned to their proper (southbound) lane a substantial distance (400 or 500 yards) before encountering the Keyser vehicle.

Sandra Williams testified that her husband last passed a car just south of Remington and that after passing it she turned and engaged her parents in conversation. She was facing the rear at the time of the impact and did not observe the approaching vehicle. Mr. Witt was severely injured and had no recollection of the accident. Mrs. Witt also knew nothing of the accident, explaining that "we had just buried my son and I was sort of in shock you might say. And I did not observe the car approaching us".

The only evidence at this point of how and why the accident occurred was the testimony given by Williams and the trooper, and such information as the photographs of the accident supplied. That was the posture of his case when Williams rested.

The evidence of Peters consisted solely of testimony given by James Carpenter and Clara Carpenter, 68 and 56 years old, respectively. Clara Carpenter, accompanied by her husband, was driving their Chevrolet automobile south on Route 29 on the day the accident occurred and stopped at the scene.

Their version of the accident is that it was caused by a southbound automobile which crossed over a solid line, passed them at a rapid rate of speed and collided with another car in the northbound lane before it (the automobile which passed the Carpenters) could return to its southbound lane. They positively identified the passing car as the Keyser vehicle, and said that a woman was driving and a little child was riding with her. This testimony was given by them repeatedly on both direct and cross-examination. Mrs. Carpenter described the passing car as "cocoa color", pointed to the Keyser car shown in the pictures as that vehicle, and said it was the same car that was involved in the collision.

Both Carpenters testified that they stopped their car at the scene and Mrs. Carpenter picked the baby up out of the snow and cared for him. She said that the baby she picked up was the same baby

that was in the car that passed her, and that the woman who got killed in the wreck was the same woman who was driving the car that passed her.

When asked if any automobile passed her just before the collision, Mrs. Carpenter said she didn't remember. She was then asked what she did remember about the collision and she replied: "All I remember, this car passed me and then all of a sudden this occurred—this—I mean they hit it." She did not remember if there was any other vehicle in front of her going in her direction at the time the car with the woman and child passed. Neither did she remember if another car was coming from the other direction. When asked if she saw the collision occur, she said "No, I didn't see anything".

According to Mrs. Carpenter, when the car passed her "I just pulled off on the side of the road just as far as I could get off the road", because "I thought it might come around and hit me". At one point in her testimony, when asked how long it was after the car passed her on the solid line until the collision occurred, she responded "I guess it was about—might have been about five minutes". Later, when asked how long it was after she pulled off the road before the collision occurred she responded "it was about a minute or so after". She described the curve south of the scene of the accident as a curve to the right.

James Carpenter testified that the lady passed them at a point in the road where it curves "a little bit", but he denied that there was a solid line there. He said the solid line was back towards the bridge, out from Remington, and that the lady "was a long ways from that line" when she passed them. He testified that after the car passed them, the collision occurred "right in the middle", because the woman who passed them was not able to get back on her side of the road. He said "she was running pretty good speed". Carpenter was asked if either he or his wife made any comment when the car passed them and he answered: "All she told me is somebody is going to get hurt." He was asked if the car that passed them was blue, brown, green, red or if he remembered the color, and answered "dull color". He, like his wife, said that the curve which they were approaching was a curve to the right.

Without question, the evidence established that involved in the accident were a blue Chevrolet automobile driven by Williams in a southerly direction and a brown Rambler automobile proceeding north, occupied by its driver, Mrs. Keyser, and her infant child. Yet the Carpenters make no mention in their testimony of a blue

Chevrolet but unequivocally identify the car traveling south as a "cocoa" or "dull colored" vehicle occupied by Mrs. Keyser and her child.

Assuming that the Carpenters were confused and mistaken as to the make, color and occupants of the car that passed them, we are left with no information as to the identity or driver of the passing car. To substitute the Williams car for the Keyser vehicle we must substitute a blue car for a brown one, a four-door sedan for a two-door vehicle, a man driver for a woman driver, four occupants for two occupants and eliminate the presence of a child in the passing vehicle.

Neither are we able to determine with any degree of certainty how close to the collision point the car passed the Carpenters. At one point in her testimony Mrs. Carpenter said five minutes elapsed between the time the car passed them and the time the collision occurred, and at another point one minute. Notwithstanding Williams and Foley were traveling south together, the Carpenters made no mention of the Foley car. They both placed the scene of the accident before a curve to the right, proceeding southward, contrary to all the evidence that the road curved to the left if proceeding south.

The testimony of the Carpenters can only be described as vague, rambling, confused and contradictory. The trial judge observed, "I don't see how you can give any weight to their testimony at all."

The principles which control our decision have been often stated and are well settled. Questions of negligence, contributory negligence and proximate cause are ordinarily questions for the jury to determine. It is only when reasonable men cannot differ as to the conclusion that such questions become a matter of law for the court to decide. In determining negligence it becomes the province of the jury to pass upon conflicting and inconsistent statements, to judge the credibility of the witnesses, and to discard or accept the testimony or any part thereof of any witness. In the instant case the jury exonerated Mrs. Keyser of negligence and found that Williams was guilty of negligence that was the sole proximate cause of the collision. This verdict has been approved by the trial court.[1] The evidence must be viewed in the light most favorable to Peters.

---

[1] At the conclusion of the evidence the trial court observed: "Gentlemen, at this stage I am inclined to strike the evidence on both sides. . . ." "This evidence is right up in the air" and later "Well, hasn't the jury got to speculate entirely whose . . . what this evidence is. all about". And later, "[B]ut this evidence is awfully weak on all sides in this case, awfully weak".

It is equally well settled that the verdict of the jury must be supported by the evidence and that a verdict found on speculation and conjecture cannot be allowed to stand. When the evidence does not support the finding of a jury it becomes the imperative duty of this court to set aside the verdict even though it has the approval of the trial court.

We find no evidence in the record from which the jury could have found that Williams was operating his car at an excessive speed, failed to keep it under proper control or failed to maintain a proper lookout. His testimony, which finds support in the physical facts, is that he was in his proper lane at the time of the collision. If a recovery is to be had against Williams, it must be on the theory that it was Williams who attempted to pass the Carpenter car and that he attempted to pass at a point on the highway where passing was prohibited and at a time when the Keyser car was dangerously near, thereby causing Mrs. Keyser to lose control of her vehicle. However, Mr. and Mrs. Williams denied passing any vehicle immediately prior to the collision. The Carpenters never noticed the Williams car until after the accident and both said the car that passed them was the Keyser vehicle. There were no other witnesses.

A possible explanation of the accident involves Foley, who was driving immediately behind Williams when the collision occurred. Williams testified that he and Foley had both passed a vehicle some 400 or 500 yards before the accident occurred. Obviously, if this vehicle was the Carpenter car—and if their passing maneuver in any way involved the approaching Keyser automobile—the second car, driven by Foley, would have been the car most likely to have been last in the northbound lane and therefore the car most likely to have caused Mrs. Keyser to swerve or take evasive action.

We take note of the fact that although Foley was very much involved in the accident and was a defendant throughout a portion of the trial, neither he nor his wife were called as witnesses. The trial judge expressed concern about this and considered calling him as the court's witness to "see what he would say", and further stated that if a non-suit had not been taken against Foley, and if he had been presiding in the case without a jury, he would have found for Peters against Foley. To this remark counsel for Peters replied: "Well I really think he was liable for it . . . but—there is no evidence to put him in there." [2]

_____

[2] The discovery depositions of Mr. and Mrs. Foley were taken by Peters with counsel for all parties present. They are part of the original suit papers in this

Williams' theory of the accident is that Mrs. Keyser lost control of her vehicle because of excessive speed, deliberate inattention or other negligence on her part. This theory was rejected by the jury, which must have concluded that her loss of control was precipitated by some negligent act of the driver of an approaching vehicle. The problem the decedent's administrator has is that to recover he must identify the offending vehicle and its driver by a preponderance of the evidence, and this he fails to do.

We cannot say with any degree of certainty how the accident occurred. We can speculate, guess, evolve numerous theories and attribute it to one of several causes, but we have to look outside the record for supporting evidence. Even if we do disregard the uncontradicted testimony of Mr. and Mrs. Williams and the incredible part of the evidence of the Carpenters, and if we assume that the car which the Carpenters say passed them did cause Mrs. Keyser to lose control of her vehicle, there still is no evidence that this passing vehicle was the Williams car or that its driver was Williams. Peters, who carries the burden of proof, is left with no evidence as to who or what caused the collision to occur.

The judgment appealed from is reversed and final judgment for Dennis Earl Williams will be entered.

*Reversed and final judgment.*

cause. The Foleys testified in great detail regarding the accident (which they both witnessed), the speed of the cars involved therein, their positions on the highway, the loss of control by Mrs. Keyser of her car, and the presence of other vehicles around the scene. Significantly, Foley said that he and Williams passed a "bus-type car", occupied by a white woman, who was driving, and a child, "up the road before the collision"; that after they passed it this bus-type vehicle "picked up speed with the rest of the cars and we all continued down the road". He said at the time of the collision he estimated the bus-type vehicle with the woman and child to be two car lengths behind him. Foley saw the approaching Keyser car go out of control and zig-zag across the road into the Williams car. He said that when he saw the collision about to occur he stopped in the southbound lane in which he was traveling, then pulled into the northbound lane around the wreck and stopped immediately south of the wrecked cars to render assistance. He said that the operator of the bus-type vehicle who was immediately behind him left the scene of the accident. The testimony of Mrs. Foley was substantially the same as that of her husband.

Therefore, if at trial the Foleys had been called as witnesses and had testified as they did on discovery, their testimony would have placed a fourth or "Jane Doe" car traveling south at the time in addition to the Williams, Foley and Carpenter cars. The possibility exists that it was this "Jane Doe" vehicle (coincidentally being driven by a woman and occupied by her and a child) which the Carpenters erroneously assumed was the Keyser car, and which (in passing the Carpenters), caused Mrs. Keyser to lose control of her car. However, since the Foleys did not testify and the discovery depositions were not introduced in evidence, their version of the accident given in the depositions cannot be considered on appeal.